## In re KLINGENBERG..

(Circuit Court, S. D. New York. June 28, 1893.)

CUSTOMS DUTIES—BOARD OF GENERAL APPRAISERS' DECISIONS—JURISDICTION OF CIRCUIT COURTS.

The customs administrative act of June 10, 1890, (26 Stat. 131,) confers no jurisdiction upon circuit courts of the United States, on the application of a dissatisfied collector of customs, to review and reverse a decision of a board of general appraisers, involving neither the classification of imported merchandise, nor the rate of duty leviable thereon, but only the value of the paper florin of Austria-Hungary, the currency in which such merchandise was invoiced. Passavant v. U. S., 13 Sup. Ct. Rep. 572, 148 U. S. 214, applied.

At Law. Motion to dismiss, for want of jurisdiction, an appeal taken by the collector of customs from a decision of a board of United States general appraisers.

One A. Klingenberg imported from Austria-Hungary into the United States, at the port of New York, certain merchandise, by the Bohemia and by the Rugia. The merchandise imported by the Bohemia was shipped from various places in Bohemia. The invoice covering this merchandise was consulated at Prague, Bohemia, July 6, 1892. The shipment of this merchandise by vessel to the United States was made from Hamburg, Germany, July 7, 1892, and this merchandise was entered for consumption at the port of New York July 23, 1892. The merchandise imported by the Rugia was also shipped from various places in Bohemia. The invoice covering this merchandise was consulated at Prague, Bohemia, July 9, 1892. The shipment of this merchandise by vessel to the United States was made from Hamburg, Germany, July 10, 1892, and this merchandise was entered for consumption at the port of New York July 26, 1892. The invoices of the merchandise of both these importations set out its value in paper florins of Austria-Hungary, but were not accompanied with consular certificates stating depreciation in value, per paper florin, from that of the gold florin, which (the gold florin) the secretary of the treasury, in his instructions to officers of the customs, issued August 3, 1892, (S 13,091,) declared was the only actual standard of value of that country. The secretary, in these instructions, directed that, in the absence of such certificates of depreciation, these officers should, in determining the value of all imported foreign merchandise, take the value of a paper florin at $0.482, which sum of $0.482, under the provisions of section 52 of the tariff act of October 1, 1890, (26 Stat. 624,) had been estimated by the director of the mint, and on July 1, 1892, (S 13,003,) proclaimed by him (the secretary) to be the value of the gold florin. The collector of customs at that port, the local appraiser having returned the invoice (and entered) amounts of these paper florins as the value in such florins of this merchandise, thereafter converted these amounts of paper florins into United States money of account, at the rate of $0.482 per paper florin, and on the amount of such money of account, so obtained, as the dutiable values of this merchandise, exacted duties of the importer according to the classifications, and at the rates, provided by law. Against the exaction of duties on any amount of such money of account in excess of the amount thereof to be obtained by converting into such money the aforesaid amounts of these paper florins at the rate of $0.32, the importer duly protested, claiming that in estimating the value of the Austrian florin, the currency in which the invoices of this merchandise were made out, the collector should have adopted the value of the standard currency of Austria, viz. the silver florin, as last—July 1, 1892—(S 13,003) proclaimed by the secretary of the treasury, ($0.32,) or the actual value of the Austrian paper florin, and that the collector had no right to adopt the (then) proclaimed value of the gold florin ($0 482) in estimating duties, because this merchandise was not purchased in gold florins,

the invoices thereof were not expressed in gold florins, and gold was not the standard currency in Austria-Hungary.

Upon the receipt of this protest the collector, pursuant to section 14 of the customs administrative act of June 10, 1890, (26 Stat. 137,) transmitted the invoices of this merchandise, and all the papers and exhibits connected therewith, to a board of three United States general appraisers on duty at that port. The board of general appraisers, upon the case thus submitted, and upon evidence taken by it, found, among other facts: (1) That the invoice value of this merchandise was given in paper florins of Austria-Hungary. (2) That the director of the mint estimated, and the secretary of the treasury proclaimed, on the 1st of July, 1892, (S 13,003,) the value of the standard coin of Austria-Hungary, the silver florin, expressed in the money of account of the United States, to be 32 cents, and that the secretary's proclamation of that date contained the additional information that the value of the gold florin (not the standard coin) was $0.482; that silver was the nominal standard; and that paper was the actual standard, the depreciation of which was measured by the gold standard. (3) That the value of the paper florin was equal to, or greater than, the value of the silver florin, the standard coin of Austria-Hungary, and that this merchandise was not purchased in a depreciated currency. (4) That section 52 of the aforesaid tariff act provides that the value of the standard coins in circulation of the various nations of the world shall be estimated quarterly, etc., and that the standard coin of Austria-Hungary, as proclaimed by the director of the mint and by the secretary of the treasury, July 1, 1892, (S 13,003,) was the silver florin in respect to which the paper florin was not a depreciated currency.

Upon the foregoing facts the board of general appraisers sustained the protest of the importers, and authorized the reliquidation of the entries of this merchandise in accordance with the claim made therein,—that the value of the paper florins in which the merchandise was invoiced should have been taken to be $0.32 per florin. Under such reliquidation, both the classification of this merchandise would be the same as that made, and the rate of duty leviable thereon would be the same as that levied, by the collector. The collector, being dissatisfied with the decision of the board of general appraisers, applied by petition, and without notice to the importer, to the United States circuit court for the southern district of New York for a review of the questions of law and fact involved therein, under that part of section 15 of the customs administrative act which provides "that if the owner, importer, consignee, or agent of any imported merchandise, or the collector, or the secretary of the treasury, shall be dissatisfied with the decision of the board of general appraisers, as provided for in section fourteenth of this act, as to the construction of the law and the facts respecting the classification of such merchandise and the rate of duty imposed thereon under such classification, they or either of them, may, within thirty days next after such decision, and not afterwards, apply to the circuit court of the United States within the district in which the matter arises, for a review of the questions of law and fact involved in such decision."

In compliance with an order granted upon such application, the board of general·appraisers made their return to the said circuit court. Thereafter, upon the aforesaid petition, order, and return, the importer moved the circuit court for a final judgment or decree dismissing the appeal of the collector from the decision of the board of general appraisers, on the ground that, under section 15 of the aforesaid customs administrative act, the circuit court had no jurisdiction to entertain or decide such appeal; there being involved in the decision of the board of general appraisers no question respecting the classification of this merchandise, or the rate of duty leviable thereon, but only a question respecting the value of the florin in which the same was invoiced.

Curie, Smith & Mackie, (W. Wickham Smith, of counsel,) for the motion.

Edward Mitchell, U. S. Atty., and Thomas Greenwood, Asst. U. S. Atty., opposed.

LACOMBE, Circuit Judge, (orally.) The case seems to be within the principles of Passavant v. U. S., 148 U. S. 214, 13 Sup. Ct. Rep. 572. Motion granted

---

## In re DUNCAN.

### (Circuit Court, S. D. New York. June 27, 1893.)

CUSTOMS DUTIES—TARIFF ACT OF OCTOBER 1, 1890—SUGAR WAFERS—CLASSIFICATION.

Sugar wafers which are made by biscuit makers of flour, sugar, milk, and eggs, flavored with vanilla, and are used exclusively as articles of table food, are not dutiable at the rate of 20 per centum ad valorem as nonenumerated manufactured articles, under the provision for such articles contained in section 4 of the tariff act of October 1, 1890, (26 Stat. 613,) but are free of duty, as "wafers unmedicated," under the provision for such wafers contained in paragraph 750 (free list) of the same tariff act, (26 Stat. 610.)

At Law. Appeal by importer from a decision of the board of United States general appraisers.

One John P. Duncan, doing business under the name of John Duncan's Sons, imported on April 16, 1891, by the Majestic, from a foreign country into the United States, at the port of New York, certain so-called "sugar wafers." These wafers were classified for duty as nonenumerated manufactured articles under the provision for such articles contained in section 4 of the tariff act of October 1, 1890, (26 Stat. 613,) and duty at the rate of 20 per cent. ad valorem, the rate specified for such articles by that section, was exacted thereon by the collector of customs of that port. Against this classification and this exaction the importer duly protested, claiming that these wafers were free of duty, as "wafers unmedicated," under the provision for such wafers contained in paragraph 750 (free list) of the same tariff act, (26 Stat. 610.) Upon the receipt of this protest the collector, pursuant to section 14 of the customs administrative act of June 10, 1890, (26 Stat. 137,) transmitted the invoice of these articles, and all the papers and exhibits connected therewith, to a board of three United States general appraisers on duty at this port.

The board of general appraisers, having taken evidence, overruled the protest of the importer, and affirmed the classification and the exaction made by the collector. The importer being dissatisfied with the decision of the board of general appraisers, applied, pursuant to section 15 of the customs administrative act, to the United States circuit court for the southern district of New York for a review of the questions of law and fact involved therein. In compliance with an order granted upon such application the board of general appraisers made its return to the circuit court, and thereafter further evidence was taken in that court.

From the evidence accompanying this return, and from the further evidence taken in the circuit court, it appeared that these articles in suit were made of flour, sugar, milk, and eggs, and were flavored with vanilla extract. That they were used exclusively as articles of table food, being of a delicate and luxurious kind; were made only by biscuit makers, and were classed in the line of biscuits. That they were known in the trade as "sugar wafers," or, more specifically, as "vanilla sugar wafers," the word "vanilla" indicating that they were flavored with vanilla extract; and that, while they contained no element of medicinal material, being in fact unmedicated, they were never known in trade and commerce as "wafers unmedicated" or "unmedicated wafers." That there were articles known among druggists and physicians as "medicinal wafers," which consisted of a thin wafer of wheat flour, were brittle when dry, but became flexible and plastic when dipped in water, and which were used to envelop nauseous medicines when administered to persons. That there were articles made from the same ma-